George Andrews, J.,
delivered the opinion of the Court.
The Exchange Bank of Tennessee was organized on the 30th day of August, 1852, under the Act of the Legislature of February 12th, 1852, commonly known as the Free Banking Law. William Spence and Joseph Spence were the sole owners and corporators, and were respectively the President and Cashier of the institution.
The statute above mentioned, provided that whenever any association of persons organized under the Act should “legally transferto the Comptroller of the State any portion of the public stocks of the State, bonds of incorporated companies indorsed by the State, or bonds of the United States, such association should be entitled to receive from the Comptroller an equal amount of circulating notes, to be registered and countersigned as required by the Act, such stocks deposited, to be, or be made to be, equal to a stock producing six per cent, interest per annum, and of par value.
The Comptroller was required to enter into bond to the State for the faithful performance of the trusts and *309 duties imposed upon him by the Act; and he was forbidden to issue to any such bank any excess of circulating notes above the value of the securities deposited with him, under penalty of removal from his office, and of being personally liable to any note-holder for the amount lost by his misfeasance.
By section 6 of the Act, on failure of the bank to duly redeem the notes, the holder might have the same protested; and the Comptroller, on filing the protest in his office, was required forthwith to give- notice in writing, to the bank to pay the same with costs and charges, and on its failure for ten days to make such payment, he was required, • unless satisfied that a defense existed to such notes, to give notice, by publication, that all the circulating notes of such bank would be redeemed out of the trust funds in his hands. The Comptroller was re-required to apply said trust funds to the payment pro rata of all such circulating notes, and for that purpose to sell the stocks and bonds deposited with him.
It was further declared by the same section: “Nor shall anything in this Act contained be considered as implying any pledge on the part of the State for any payment beyond the proper application of the securities pledged to the Comptroller.”
By the amendatory Act of February 14th, 1856, it was enacted that any bank organized under the Act might increase or decrease its circulation at pleasure, by withdrawing or increasing its bonds in the hands of the Comptroller, “provided, the amount of bonds is never diminished below one hundred thousand dollars, nor increased above three times, the amount paid in capital.”
*310 Violations of any of the provisions of said Act was declared to be a forfeiture of the charter, and upon proof thereof, the Comptroller was directed to put the bank in liquidation.
Should any bank fail to redeem its issues and have to be wound up, any person or persons holding one thousand dollars of the notes of the bank, might present them to the Comptroller and receive from him in lieu thereof one thousand dollars in bonds at New York market value; provided the price was not under par.
It was provided that the bonds required to be deposited with the Comptroller “ shall be placed upon deposit in the Bank of Tennessee,” and “shall be subject to the order of the Comptroller only for the purpose of carrying into effect this Act and the Act which this is intended to amend.”
Under the provisions of these statutes, the Exchange Bank of Tennessee was organized and went into operation at Murfreesboro’, in this State, and continued to do business until the month of May, 1858. During the year 1857 it became embarrassed, and suspended specie payment;' but it does not appear that any of its notes were protested, or that any steps were taken by the Comptroller or any other persons to place the bank in process of liquidation or to enforce payment of its notes, until the year 1860, when the complainant and others took steps as hereinafter mentioned.
During the period in which the bank was in operation its capital was increased, and its circulation was at various times increased and diminished under the provisions of the Act of 1856, by increase or withdrawal of *311 its bonds on deposit with the Comptroller, until in May, 1858, it was discovered that the bonds on deposit with the Comptroller in the Bank of Tennessee amounted only to $93,000, while the outstanding circulation of the bank was greatly in excess of that amount. How this discrepancy occurred it is very difficult to determine from this record. It is claimed for the complainants that bonds to secure all the circulation of the. Exchange Bank were duly deposited with the Comptroller, and that they were lost or abstracted through the fault of the Comptroller, or of the officers of the Bank of Tennessee, where they were kept; while the defendants insist that no bonds have been lost, and that the mistake or fraud occurred in the matter of issuing new notes or in failing to return and cancel old ones.
Eor some time previous to the 13th of May, 1858, the Bank of Tennessee had had extensive dealings with the Exchange Bank, and had been taking up and protecting the circulation of the latter. In the course of these transactions the Bank of Tennessee had accumulated about $125,000 of the circulation of the Exchange Bank, and was pressing the latter bank to redeem or secure the payment of these notes.
Under these circumstances, an arrangement was made, by which "William Spence, President of the Exchange Bank, gave his promissory notes to the Bank of Tennessee, with L. H. Carney as security, and the Bank of Tennessee delivered to .Spence the notes of the Exchange Bank which it held, or most of them.
Spence took about $93,000 of the notes thus obtained by him to the Comptroller, and received from him an or *312 der upon the Bank of Tennessee for the $93,000 in bonds on deposit for the Comptroller, in that bank. Having thus secured the bonds, Spence delivered them to Carney, his security, together with $53,000 in other bonds owned by him, which the Bank of Tennessee had up to that time held as collateral security for the same circulation in its hands. Carney thereupon sold all these bonds, amounting, at their par value, to $146,000, to the Bank of Tennessee, and with them took up the notes of Spence on which he was security. There is a considerable degree of confusion and uncertainty in the record as to the exact form which this transaction assumed, but it was substantially as above stated; and there is no conflict in the testimony as to the fact that Spence himself returned the circulation to the Comptroller and received from him the order for the ninety-three bonds.
On the 30th day of March, 1860, the complainant, Benjamin P. Clark, having previously procured one of the notes of the Exchange Bank to be protested and filed with the Comptroller, presented to said Comptroller the sum of five thousand dollars in the circulating notes of said bank, and demanded of him, in exchange therefor, an equal amount of bonds belonging to the Exchange Bank, and which he claimed to be entitled to receive under the provisions of the Act of 1856. The Compr troller, who was the successor of the officers who had received the bonds and issued the circulation to the bank, thereupon gave to Clark an order, reciting that the presentation of the notes of the bank countersigned by a Comptroller of the State, raised a presumption that the bonds required by law had been deposited with the Bank *313 of Tennessee, and requiring that Bank to deliver to Clark five thousand dollars in the bonds belonging to said Exchange Bank.
Clark presented this order to the Bank of Tennessee, the officers of which refused to deliver any bonds thereupon, and stated that no bonds belonging to the Exchange Bank were on deposit with the Bank of Tennessee.
Clark thereupon filed the bill in this cause against the State of Tennessee and the Bank of Tennessee. The bill states the organization of the Exchange Bank, the business done by it, and that bonds were deposited by it with the Comptroller to the amount of upwards of $450,-000, and circulation issued thereon; that complainant is the holder of $5,000 of said notes, and had made demand, as above stated, for an equal amount of the bonds of the Exchange Bank. It charges that the State assumed the responsibility of applying the bonds deposited with the Comptroller to the redemption of the notes of the Exchange Bank; that the deficiency has arisen from the default of the Comptroller or the Bank of Tennessee; and that the State or the Bank of Tennessee should provide for the redemption of said notes.
The bill prays for a decree against the State and the Bank of Tennessee for the amount of the notes which the complainant holds, and for general relief.
Several other bills were filed by other parties holding notes of the Exchange Bank, the bills containing similar allegations, and making the- same parties as that above-mentioned.
All these bills were consolidated by the order of the Chancery Court.
*314 The Bank of Tennessee filed its answer in the consolidated suit, incorporating in the answer a demurrer for want of equity, and that the complainants should have exhausted their remedy against the Exchange Bank and its owners and against the State Comptrollers and their securities, by obtaining judgment and execution, before filing their bills.
The State also filed an answer, and demurred in the answer: 1st, Eor want of equity. 2d, That the State
is not liable for the laches of its officers. 3d, That the State is not liable to be sued.
The demurrers were not disposed of previous to the final hearing on pleadings or proofs.
The answer of the Bank of Tennessee was filed as a cross bill for the purpose of establishing as a defense that the complainants had not procured the bills of the Exchange Bank held by them in due course of trade, but had purchased them at a discount, and insisting that, in such case the complainants could only recover the amount actually paid for the bills, if any thing. It appears from the answers of the complainants to this cross bill that a considerable portion of the bills held by the complainants were purchased at a great discount.
The Chancellor dismissed the bill as against the State of Tennessee, and decreed that the Bank of Tennessee, having received and appropriated the ninety-three bonds to its own exclusive benefit, should account to the complainants in the consolidated bills for the proportion of their value to which, as note-holders, they were entitled.
• We do not think that we can consider it as satisfactorily established that any of the bonds deposited with *315 the Comptroller,- or in the Bank of Tennessee, were lost through the fault of that Bank or of its officers, and we therefore do not inquire what the effect of a loss so caused might be if established.
The business of the Comptroller’s office was, for a long time, conducted with utter blundering incompetency and carelessness. ISTo records, except a few imperfect memo-randa, were kept of the bonds deposited and withdrawn, or of the circulating notes issued and returned; and it is simply impossible to determine from this record, by what means the deficiency occurred.
It is certain that through the carelessness, incompetency, or fraud of the persons, or of some of them, charged by law with the duty of keeping the bonds deposited by the Exchange Bank and of issuing circulating notes to that Bank, there was in circulation in the community a very large amount of bills of the bank, beyond the amount of bonds on deposit to secure them.
The first question is, whether the State of Tennessee can be made liable to the persons holding such bills to-make good the deficiency in the amount of bonds which were, or should have been, deposited to secure this circulation?
The State assumed no liability, directly, as guarantor of the notes issued to the Exchange Bank, and- in fact, such liability is expressly negatived by the- terms of the Act of 1852.
But it is claimed that the State, having by law required the several Free'Banks to deposit bonds with the Comptroller, who is an officer of the State, to secure the payment of the bills of these banks, -and having made *316 it the duty of that officer to issue countersigned circulating notes to those banks to the amount, and only .to the amount, of such deposit of bonds, it thereby assumed the duty and responsibility of safely keeping the bonds so deposited as a trust fund; and that, if by the negligence or fraud of the officers or agents of the State, any deficiency results in that trust fund, the State is liable to make good such deficiency to the persons entitled to the benefit of the fund.
It is further claimed, that, if not so liable upon an implied undertaking to safely keep and properly administer this trust fund, the State is liable by the terms of section 6 of the Act of 1852, under which the Free Banks were organized.
That section after providing that, in case any bank shall make default in redeeming its circulating notes, the bonds deposited shall be sold and the proceeds distributed in redemption of such notes, contains, also, the following provision: “Nor shall any thing in this Act contained be considered as implying any pledge on the part of the State for any payment beyond the proper application of the securities pledged to the Comptroller.”
The argument is, that in negativing the liability of the State for any payment beyond the proper application of the securities pledged, the statute implies the converse proposition, that for the proper application of these securities, the State will be liable.
As to the first point: We are of the opinion that the State is not liable to its citizens, in the absence of express guaranty or undertaking to that effect, for the loss of bonds, or to make good a deficiency in their *317 amount caused by tbe fraud or negligence of the officers or agents of the State.
The State may contract with one of its citizens, and a liability to the citizen may arise by the terms of the contract. But the relation of the State to the citizen is not in such sort the relation of an agent to his principal, that for any failure properly to perform the functions of government, the State will be liable in damages to the citizen.
The Constitution of this State provides that writs may be brought against the State in such manner and in such courts as the Legislature may by law direct. And section 2807 of the Code, in force at the time these bills were filed, provides that “actions may be instituted against the State under the same rules and regulations that govern actions between private persons.”
The constitutional and statutory provisions provide a remedy for any existing cause of action, but do not ■change the relation between the State and the citizen so as to create any liability or responsibility on the part of the State.
The relation of the State to the citizen is not one of contract, which implies an undertaking upon good consideration, on the part of the State, that all the functions of government shall be duly performed, or that it will employ none but capable and faithful agents.
If an officer or agent of the State, in violation of law, commits an act to the injury of the citizen, it is an act beyond the scope of his agency, unauthorized by his principal; and the State is not liable therefor to the party injured.
*318 And the State did not assume, in regard to the securities deposited with the Comptroller, the relation of agent, bailee or trustee for the banks depositing them.
Had the Legislature declared that these securities should be received and held by the State as a trust fund, of which the State itself should be the trustee, a different question would have been presented. But it is not so declared.
The State has, by law, provided that the bank should deposit certain securities in pledge with an officer of the State, for the purpose of protecting the holders of the notes. The State law provides for the creation of this trust fund, and directs the mode of its administration. But this does not constitute the State itself the trustee, and subject it to all the liabilities and responsibilities attaching to that character. The character of trustee does not attach to the State itself in regard to this fund, any more than in regard to trust funds which may be held as such by the courts of the State, or moneys collected for the citizen by the ministerial officers of the law. In all these cases the State has provided by law that certain tribunals or officers shall be the custodians of the funds in question; but this does not render the State liable as trustee, bailee or agent.
Hence, it follows that, though where the statute gives the remedy, the State may be sued upon its contracts with .its citizens, such a statute nmrely gives a remedy, but does not create any new liability, and does not, without more, render the State liable to an action for the negligence or the torts of its officers and agents.
The State is therefore not liable to the complainants *319 for the loss of the securities deposited in this case, or for the wrongful over-issue by the officers of the State of circulating notes, if such over-issue occurred, unless it has made an undertaking to that effect.
Whether the proviso above recited in the Act of 1852, is to be construed as such undertaking on the part of the State, is another and a more difficult question.
We do not think, however, that such was the intention of the Legislature, or that such construction can be given to the statute.
There is certainly no express undertaking on the part of the State in the words quoted; and the declaration that the Act shall not be considered as implying any pledge on the part of the State for any payment beyond the proper application of the securities pledged, does not express or imply the affirmative declaration that the State does pledge itself that the securities shall be properly applied, and will make the loss good if- they are not.
The statute recognizes the duty of the State in discharge of the functions of government, to cause these securities to be held and applied in a certain manner; and the words in question were evidently introduced out of abundant caution, not for the purpose of expressing an affirmative agreement to guaranty the safe keeping and proper disposition of the securities, but to prevent any possible inference that in providing for the countersigning, issuance and redemption of the circulating notes by the officers of the State, the State was undertaking to guaranty the payment of the notes so countersigned and issued.
*320 We conclude that no liability on the part of the State to the complainants is shown in this suit; and the Chancellor properly dismissed the bill as against the State. It is therefore necessary to inquire whether the Act of 1865, chap. 36, repealing section 2807 of the Code, which permits and regulates the bringing of suits against the State, can have any effect upon a cause of action previously accrued.
The question next before us is as to the liability of the Bank of Tennessee to the complainants, arising out of the purchase made by that bank of the ninety-three bonds withdrawn by Spence, as President of the Exchange Bank, from the Comptroller, on the 18th of May, 1858.
It is urged on behalf of the Bank of Tennessee, that Carney, having become the holder of a large amount of the bills of the Exchange Bank, went himself to the Comptroller, and having surrendered the requisite amount of the circulation, himself received these bonds from the Comptroller, under the provisions of section 10, of the Act of 1856.
Whether, had the transactions assumed that form, it would have been different in legal effect, it is not material to inquire, as we are satisfied from the evidence in this record, that it was Spence himself, and not Carney, who took the bills of the Exchange Bank to the Comptroller, and received from him the bonds in ques_ tion.
We are also satisfied that, at the time when these bonds were thus withdrawn from the Comptroller, Spence, Carney, and the officers of the Bank of Tennes *321 see were aware that the ninety-three bonds in question were all which the Exchange Bank had on deposit with the Comptroller, and that the circulation of the Exchange Bank was at that time, more than one hundred and sixty thousand dollars. Morton, the President of the Bank of Tennessee, testifies that Spence told him at the time of this transaction, that the circulation of the Exchange Bank was at that time, one hundred and sixty-four thousand dollars; and the Bank of Tennessee then actually held about one hundred and twenty-four thousand dollars of this circulation. The arrangement by which the cir-lation was obtained from the Bank of Tennessee and delivered to the Comptroller, and the bonds withdrawn and finally delivered to the Bank of Tennessee in discharge of the note of Carney and Spence, was evidently practically but a single transaction, participated in by Spence, Carney and the officers of the Bank of Tennessee, with full knowledge of the existing facts.
This withdrawal of the bonds by Spence was clearly illegal. Spence was acting on behalf of the Exchange Bank, of which he was President. The Bank was allowed by law to withdraw bonds upon a return of circulation, but was not permitted to reduce the amount on deposit below one hundred thousand dollars. That the bonds on deposit were already reduced below that amount must have been known to all the parties to the transaction.
The securities required by the statute to be deposited with the Comptroller are denominated in the Act “trust funds,” and such is essentially their character. They are deposited for the benefit and protection of the note-hold *322 ers, who are entitled, in case the bank is wound up, to share pro rata in their proceeds, and each of whom, has an interest in the fund.
No one of those interested can be permitted to absorb and appropriate the entire trust fund to the exclusion of others of the same class, whose equities and interest in the fund are equal to his: Marr vs. Bank of West Tennessee, 4 Cold., 476.
The Bank of Tennessee received the bonds in question from Spence or Carney, with notice of the trust impressed upon them, and of the illegality of their withdrawal from the Comptroller; and it must be held to have taken them charged with the trust and to have become itself a trustee with regard to these bonds for the benefit of all persons entitled to share in the proceeds thereof.
We do not rest the decision of this point upon the ground strongly urged upon the hearing, and which it is not necessary to pass upon: that the Bank of Tennessee, being the custodian of the securities deposited, occupied such a relation of trust or confidence toward the fund that it could not be permitted to derive an advantage from any transaction in regard to them; but upon the broad principle of equity that one cestui que trust shall not be permitted knowingly to appropriate to his own benefit the entire fund which was provided equally for him and for others.
We do not think that the fact that a portion of the notes of the Exchange Bank held by the complainants were purchased by them at a discount, lessens or affects their rights in the premises. The statute makes no dis- *323 scrimination against sucli purchasers. The notes are negotiable, and the purchaser takes in regard to the right to payment, all the rights and equities of his vendor.
Decree of the Court below affirmed, and cause remanded.